## CIRCUIT COURT OF THE CITY OF RICHMOND

Interactive Return Service, Inc.

v.

Virginia Polytechnic Institute
and State University et al.

April 20, 2000

Case No. LE-3014-4

BY JUDGE RANDALL G. JOHNSON

This is a claim for breach of contract. It is before the court on motions to dismiss and for summary judgment.

In January 1995, plaintiff, Interactive Return Service, Inc., ("IRS") and defendant Virginia Polytechnic Institute and State University ("Virginia Tech") entered into a contract under which Virginia Tech agreed to perform certain research for plaintiff to assist plaintiff in commercializing certain technology for which plaintiff had a patent pending. Under the contract, if the research resulted in an invention conceived by Virginia Tech personnel, such invention "will be assigned to the Center for Innovative Technology (CIT)," a nonstock, tax-exempt corporation organized under Virginia's Innovative Technology Authority Act of 1984, Va. Code §§ 9-250 *et seq.*, one of whose purposes is to "enhance and expand the scientific and technological research and development capabilities of the institutions of higher education in the Commonwealth and coordinate such capabilities with the scientific and technological research and development activities and requirements of the public and private sectors, including transferring technological advances to the private sector." Va. Code § 9-252(A)(iv). CIT is also a defendant to the suit.

If the research resulted in an invention conceived jointly by plaintiff and Virginia Tech personnel, it "shall be jointly owned by [plaintiff] and CIT." If the research resulted in an invention conceived by plaintiff's personnel, it "shall be owned by [plaintiff]." The contract also provided that "[a]ll results of the research including but not limited to, all works[,] products and deliverables, will be the exclusive property of [plaintiff]."

In December 1994, shortly before the contract between plaintiff and Virginia Tech was entered into, plaintiff and CIT entered into a licensing option under which CIT granted plaintiff an exclusive option to acquire the worldwide license(s) to any invention(s) resulting from the research conducted by Virginia Tech under the contract between plaintiff and Virginia Tech, after Virginia Tech assigned such invention(s) to CIT. The motion for judgment alleges that both contracts were breached.

With regard to the contract between plaintiff and Virginia Tech, plaintiff alleges that instead of delivering the results of the research to plaintiff, Virginia Tech granted an option to Proceso Interactivo S.A. de C.V. ("PISA"), a competitor of plaintiff located in Mexico, for exclusive, worldwide license rights to the results of the research. PISA has exercised the option and has obtained a worldwide license to the research results.

With regard to the contract between plaintiff and CIT, the motion for judgment alleges that CIT failed to offer plaintiff an opportunity to exercise its option to acquire exclusive worldwide licenses for inventions resulting from the research or even to inform plaintiff that any such invention had come into existence. Plaintiff seeks damages against each defendant in the amount of $275,000,000.

Virginia Tech has filed a motion for summary judgment. CIT has filed a motion for summary judgment and a motion to dismiss. CIT's motions are practically identical and will be dealt with together. They are based on two grounds. First, CIT argues that the contract between plaintiff and Virginia Tech is *ultra vires*; that is, that Virginia Tech personnel had no authority to enter into it. Second, CIT argues that the option provision in its contract with plaintiff expired by its terms before plaintiff sought to exercise it.

Virginia Tech's motion for summary judgment is based on four grounds: first, that plaintiff is estopped from claiming a breach of its contract with Virginia Tech because plaintiff had committed a prior breach of the same contract; second, that plaintiff's claim for damages is too speculative to form the basis of a breach of contract action; third, that plaintiff's contract with Virginia Tech is *ultra vires*, the same argument made by CIT; and fourth, that Virginia Tech did not breach its contract with plaintiff. For the reasons that follow, all of the motions will be denied.

## I. *Ultra Vires*

Virginia Code § 23-4.4 provides:

> § 23-4.4. *Authorization to transfer interest; Governor's approval required under certain circumstances.* — The Boards of Visitors, the State Board for Community Colleges, or their designees may transfer any interest they possess in patents and copyrights or in materials in which the institution claims an interest under its patent or copyright policy. However, the Governor's prior written approval shall be required for transfers of such property developed wholly or significantly through the use of state general funds and either (i) such property was developed by an employee of the institution acting within the scope of his assigned duties, or (ii) such property is to be transferred to an entity other than the Innovative Technology Authority, an entity whose purpose is to manage intellectual properties on behalf of nonprofit organizations, colleges and universities, or an entity whose purpose is to benefit the respective institutions. The Governor may attach conditions to these transfers as he deems necessary. In the event the Governor does not approve such transfer, the materials shall remain the property of the respective institutions and may be used and developed in any manner permitted by law. The State Council of Higher Education working in cooperation with the state-supported institutions of higher education and in accordance with § 23-9.10:4 shall adopt a uniform statement defining (i) the conditions under which a significant use of general funds occurs and (ii) the circumstances constituting an assigned duty.

The parties have stipulated that any invention or other material arising out of the research was "developed wholly or significantly through the use of state general funds," and that plaintiff is "an entity other than the Innovative Technology Authority," etc. It is also clear from the parties' pleadings and arguments that "such property [if any] was developed by an employee of [Virginia Tech] acting within the scope of his [or her] assigned duties." It is defendants' position that because the assignments of inventions contemplated by plaintiff's contract with Virginia Tech were not approved by the Governor in accordance with the above statute, such contemplated assignments were *ultra vires* and void. This is true, according to defendants, even though it was clearly the intent of the parties that such assignments would occur and even though plaintiff was obligated under the contracts to pay significant sums of

money to fund the research. In fact, the law is clear that governmental bodies cannot be bound by contracts entered into by their officers, agents, and employees if such contracts are not in compliance with law.

In *County of Alleghany v. Parrish*, 93 Va. 615, 25 S.E. 882 (1896), the County Court of Alleghany County, in 1853, gave Andrew Damron and William Skeen leave to construct buildings on the courthouse square upon the condition that the buildings be used only as law offices. Pursuant to that agreement, Damron and Skeen erected law offices on the courthouse square. In 1858, the county court entered an order directing the clerk of court to convey to Damron and Skeen "the right to build, and enjoy the use of the land on which said buildings were erected, and to sell and convey the same so long as the offices erected by them are used as law offices, by yielding and paying annually (each) as a ground rent the sum of one dollar." 93 Va. at 616. In 1874, Damron sold his law office and all of the rights and privileges he had acquired as just set out to a Mr. Parrish, and in 1885 the board of supervisors gave Parish leave to build an addition to that office upon the same terms and conditions as were applicable to the existing offices. The addition was built and it and the existing offices continued to be occupied until 1893, some forty years after the initial conveyance, at which time the board of supervisors demanded possession. It was the board of supervisor's argument that the county court's grant to Damron and Skeen and its own grant to Parrish were contrary to a provision of the Code of Virginia of 1849, which was in force when the subject grants were made and which provided that each county was to provide two acres of land upon which to build a courthouse, a clerk's office, and a jail, and that the residue of such land was to be "planted with trees and kept as a place for the people of the county to meet and confer together." *Id.* at 619 (*see* Code of Virginia of 1849, ch. 50, § 1, p. 255). In agreeing with the board of supervisors that they had the right to immediate possession of the property, the Supreme Court said:

> It is settled beyond controversy that the agents, officers, or governing body of a municipal corporation, or of a county cannot bind the corporation by a contract which is beyond the scope of its powers. The inhabitants of a municipal corporation are its incorporators, and the officers are but the public agents of the corporation. Their duties and powers are prescribed by statute or by charter, which all persons not only may know, but are bound to know. It results from this doctrine that contracts not authorized by the charter, or by statute, and which are, therefore, not within the scope of the powers of the

corporation, are void, and in actions thereon the corporation may successfully set up as a defence its want of power.

93 Va. at 621.

Similarly, in *Deal v. Commonwealth*, 224 Va. 618, 299 S.E.2d 346 (1983), Richard L. Deal and Associates ("Deal") entered into a contract with the Commonwealth of Virginia under which Deal agreed to furnish certain computer processing services. The contract, executed for the Commonwealth by the Acting Data Processing Contracts Manager, provided that disputes "will be settled by arbitration . . . and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof." 224 Va. at 620. Deal submitted a claim to the Commonwealth for $25,116.85 allegedly due for extra work. In a letter denying the claim, the Commonwealth suggested the possibility of settling the dispute by arbitration. Deal filed a demand for arbitration, the parties agreed on an arbitrator, and a hearing was held. At the hearing, the Commonwealth was represented by the Office of the Attorney General. Counsel for both parties made opening statements, examined witnesses, introduced documentary evidence, and made closing arguments. The arbitrator made an award in Deal's favor in the amount of $20,000. When the Commonwealth refused to pay, Deal filed a motion under Va. Code § 8.01-579 to reduce the award to judgment. The Commonwealth argued that its agreement to arbitrate was not enforceable because it is not a "person" or "party" authorized by Va. Code § 8.01-577 to "enter into a written agreement to arbitrate which will be as binding as any other agreement." *Id.* The Supreme Court agreed:

> [A]n *ultra vires* contract is void *ab initio* — "not voidable only, but wholly void, and of no legal effect", and "[n]o performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it." . . . "When the contract is once declared *ultra vires*, the fact that it is executed does not validate it, nor can it be ratified so as to make it the basis of suit or action, nor does the doctrine of estoppel apply."

224 Va. at 623 (citations omitted).

Calling the result "offensive and unfair," *id.*, the Court nevertheless refused to enforce the arbitrator's award. It is the present plaintiff's position, however, that the holdings of *Parrish* and *Deal* are not applicable to its contract with Virginia Tech because the transfers provided for in that contract *are* authorized by statute. The court agrees.

The requirement for gubernatorial approval before a state institution of higher learning may transfer the products of research is not absolute. Virginia Code § 23-4.4, set out above, requires such approval only when a board of visitors seeks to transfer an "interest they possess in patents and copyrights or in materials in which the institution claims an interest *under its patent or copyright policy*." Emphasis added. The adoption of such a policy is required by Va. Code § 23-4.3:

> § 23-4.3. *Adoption of patent and copyright policies; employees to be bound by such policies.* — A. The boards of visitors of state-supported institutions of higher education and the State Board for Community Colleges shall adopt patent and copyright policies consistent with the policy guidelines promulgated by the State Council of Higher Education working in cooperation with the state-supported institutions of higher education pursuant to § 23-9.10:4. Such policies shall be submitted to the Council.
>
> B. All employees of state-supported institutions of higher education, including the Virginia Community College System, as a condition of employment, shall be bound by the patent and copyright policies of the institution employing them. Anyone using facilities of a state-supported institution who has not otherwise entered into a written contract with the institution concerning such use shall be subject to the institution's patent and copyright policies where the institution's Board of Visitors, the State Board for Community Colleges or their designees determine that such use constitutes a significant use of the institution's facilities.

Virginia Tech's patent and copyright policy is contained in Virginia Tech's "Policy 13000: Policy on Intellectual Properties." Section 2.4(A) of that policy provides, in pertinent part:

> 1. *Sponsor Rights*: In the case in which an IP [intellectual property] is generated as a result of research funded by a private sector company under a sponsored research project, the IP rights of the sponsor as defined in the applicable clauses ("Patents and Copyrights," "Intellectual Properties," "Inventions," etc.) of the Sponsored Research Agreement (as approved by the Associate Provost for Research and signed by an authorized officer of the university) *shall take precedence over the rights of the university/inventor(s).*

Emphasis added.

The contract at issue in this case called for funding by plaintiff, a private sector company. Plaintiff's rights were defined in the contract. The contract was approved by the Associate/Vice Provost for Research, and it was signed by an authorized officer of Virginia Tech. Thus, plaintiff's rights as set out in the contract "take precedence over the rights of the university/inventors." Since gubernatorial approval of transfers such as the ones at issue here is only required when Virginia Tech makes a claim to the property which is subject to the transfers, and since Virginia Tech had given up its claim to such property in a contract specifically authorized by statute, the contemplated assignment of inventions and other materials under plaintiff's contract with Virginia Tech was not *ultra vires*. Accordingly, this ground of defendants' motions for summary judgment is without merit and is rejected.

## II. *Option Agreement*

The provision in the contract between plaintiff and CIT allowing plaintiff to acquire the worldwide license(s) to any invention(s) resulting from the research project, after Virginia Tech assigned such invention(s) to CIT, required plaintiff to exercise the option before December 31, 1996. Since the option was not exercised by that date, CIT argues that summary judgment should be granted in its favor. The court finds, however, that there are at least two material issues of fact with regard to the option that are genuinely in dispute. *See* Rule 3:18 of the Rules of the Supreme Court of Virginia. First, it is plaintiff's position that defendants improperly withheld information that would have let plaintiff know that materials subject to its contracts had been developed and that such withholding of information prevented plaintiff from exercising its option in a timely manner. In this regard, the fact that the parties have stipulated that "[t]here is no evidence that CIT was aware of the existence of any invention or discovery prior to July 1, 1997" makes no difference. The time for presenting evidence is at trial, not in a motion for summary judgment. In fact, plaintiff argues in its memorandum in opposition to CIT's motion that an invention claimed by Virginia Tech to have arisen out of the research was developed in October 1996 and that CIT was on the "distribution list" for such inventions. Thus, according to plaintiff, CIT knew two months before the expiration of the option that an invention existed but failed to notify plaintiff of that fact. If that is true and if it is also true, as plaintiff alleges, that it was the intent of the parties that Virginia Tech and CIT keep plaintiff informed of inventions and other materials arising out of the research as they were developed, then the failure of CIT to inform plaintiff of

an invention before December 31, 1996, would be an extremely relevant fact in this action. Indeed, the court would be more than a little surprised if either defendant seriously takes the position that in a research project sponsored by plaintiff and in which the parties agreed plaintiff would own or be assigned all of the materials resulting from the research, that it was *not* the intention of the parties that plaintiff be kept fully informed of the research's progress. How else could plaintiff exercise the rights that the parties agreed plaintiff would have?

The other known material fact that is genuinely in dispute is whether the option actually expired on December 31, 1996, or was extended. On that issue, plaintiff points out that the contract between plaintiff and Virginia Tech contemplated that the research would be completed by September 1995. That would give plaintiff fifteen months (that is, until December 1996) in which to analyze the value of any inventions developed by Virginia Tech before having to decide whether to exercise its rights under its agreement with CIT. Plaintiff alleges that Virginia Tech failed to meet the contractual deadline for completing its research and that plaintiff "repeatedly requested, and defendants repeatedly agreed to extend the due date for Tech to complete its research and assign any inventions developed by that research to CIT for license to" plaintiff. The time for Tech's performance was ultimately extended until June 30, 1997. Plaintiff's Memorandum in Opposition to Center for Innovative Technology's Motion for Summary Judgment, at 8. The court, of course, does not know if plaintiff's allegations are true. The court holds, however, that if they are true, plaintiff must be allowed to present evidence to the court or to a jury to show that it was the parties' intent that plaintiff still be allowed fifteen months from the end of the research period in which to exercise its rights under the option. Summary judgment for defendants would "short circuit" that opportunity. *See Renner v. Stafford*, 245 Va. 351, 429 S.E.2d 218 (1993).

The court also notes that CIT relies on its director's affidavit, filed with its motion, in which the director states that "[to his] knowledge, Virginia Tech never transferred any technology, intellectual property, invention, work product or deliverable to CIT." Thus, according to CIT, there was nothing for plaintiff to exercise its option on. As already noted, however, plaintiff has alleged that an invention *was* developed by Virginia Tech and that CIT was on the "distribution list" for such inventions. In any event, the court does not consider affidavits when ruling on motions for summary judgment unless all parties agree. Evidence must be weighed by the trier of fact at trial, not by the court on a motion for summary judgment.

## III. *Plaintiff's Alleged Breach of Contract*

What has just been said about the impropriety of granting summary judgment on the issue of the licensing option is also applicable to Virginia Tech's motion for summary judgment based on plaintiff's alleged breach of contract.

As noted earlier, plaintiff was the sponsor of the research conducted by Virginia Tech and was supposed to make payments to Virginia Tech in accordance with an agreed-upon schedule. According to the parties' stipulation, the first payment of $14,923.69 was due on March 10, 1995. At that time, plaintiff owed Virginia Tech a total of $84,220.57. Also according to the parties' stipulation, "this pattern of delayed payment" by plaintiff continued until January 16, 1997. At that point, plaintiff owed Virginia Tech $725,526.31. Also at that point, Virginia Tech made a final demand for payment. Payment has never been made. It is now Virginia Tech's argument that plaintiff's failure to make payment as required under the contract is a breach that prevents plaintiff from alleging a breach by Virginia Tech, even if one occurred. The court disagrees.

It is true that "[t]he party who commits the first breach of a contract[] is not entitled to enforce it, or to maintain an action thereon, against the other party for his subsequent failure to perform." *Hurley v. Bennett*, 163 Va. 241, 253, 176 S.E. 171 (1934). There is a dispute in this case, however, over whether plaintiff's breach was waived by Virginia Tech, plaintiff arguing that the contract was repeatedly renewed by defendants even after plaintiff failed to make scheduled payments on time. In fact, the parties' stipulation that by letter dated December 9, 1996, almost two years *after* plaintiff's first missed payment and in the midst of what the parties have stipulated was plaintiff's "pattern of delayed payment," Virginia Tech "offered to extend the IRS/Tech contract through June 30, 1997," and that IRS accepted the extension, is at least *some* evidence that prompt payment by plaintiff was not crucial to Virginia Tech. Plaintiff must be given the opportunity to show that all claims of breach of contract based on plaintiff's nonpayment were likewise waived.

## IV. *Speculative Damages*

Virginia Tech also argues that plaintiff's action must be dismissed because even if plaintiff proves a breach of contract, any damages awarded would be speculative. The argument is based on the fact that any invention that was developed during the subject research and that the court or a jury determines should have been transferred to plaintiff would be a brand new

item not accompanied by any history that would allow a reasonable estimate of lost profits. Among the cases cited by Virginia Tech in support of its argument is *Country Club Associates Limited Partnership v. Federal Deposit Ins. Corp.*, 918 F. Supp. 429 (D. D.C. 1996), in which the court denied damages for lost profits because the project at issue was "a new, undeveloped business [which] would be based on speculation and conjecture." *Id.* at 436. In Virginia, this principle is known as the "new business rule":

> When an established business, with an established earning capacity, is interrupted and there is no other practical way to estimate the damage thereby caused, evidence of the prior and subsequent record of the business has been held admissible to permit an intelligent and probable estimate of damages . . . . But where a new business or enterprise is involved, the rule is not applicable for the reason that such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages.

*Mullen v. Brantley*, 213 Va. 765, 768, 195 S.E.2d 696 (1973) (citations omitted). *See also Commercial Business Systems v. BellSouth*, 249 Va. 39, 50, 453 S.E.2d 261 (1995).

The rule, however, is not absolute. In the recent case of *Lockheed Info. Mgmt. Systems v. Maximus, Inc.*, 259 Va. 92 (2000), Lockheed and Maximus submitted bids pursuant to a request for proposals issued by the Virginia Department of Social Services. The request involved "privatizing" two of the Department's child support enforcement offices in northern Virginia. After the Department issued its Notice of Intent to award the contract to Maximus, Lockheed filed a protest pursuant to statute alleging, among other things, that two members of the evaluation panel had undisclosed conflicts of interest. The protest resulted in the Notice of Intent being cancelled and the contract being awarded to Lockheed. Maximus then filed an action in this court alleging, among other things, tortious interference with a contract expectancy. Among the arguments raised by Lockheed was one based on the "new business rule." The argument was rejected by this court and the Supreme Court:

The trial court observed that if, as Lockheed suggests, the new business rule were applied as an absolute bar to damage recovery in this case, a cause of action for intentional interference with a contract expectancy would be meaningless, because "anybody anywhere in Virginia could lie, cheat, and steal to deprive any new business, or any existing business that has never operated in Virginia, of a contract expectancy with complete civil impunity." The trial court rejected this construction of Virginia law, and, relying on the principle discussed in *Wood v. Pender-Doxey Grocery Co.*, 151 Va. 706, 144 S.E. 635 (1928), concluded that "the fact that Maximus had never engaged in collecting child support in Virginia cannot be used to deprive it of damages."

In *Wood*, a plaintiff was allowed to recover damages for breach of contract including lost "good will" even though, as the appellant argued in that case, the evidence of the damages was difficult to calculate with mathematical precision or reasonable certainty. The Court in *Wood* allowed recovery, reasoning that in cases involving an intentional wrong, "the degree of proof necessary is much relaxed in favor of the injured party. Where the wrongdoer creates the situation that makes proof of the exact amount of damages difficult, he must realize that in such cases 'juries are allowed to act upon probable and inferential, as well as direct and positive, proof.' . . ." 151 Va. at 713, 144 S.E. at 638. Applying this rationale, the trial court concluded that Maximus introduced sufficient evidence upon which "a reasonable estimate of Maximus' lost profits could be made."

Based on this record, we cannot say the trial court erred by refusing to apply the new business rule to strike Maximus' evidence on lost profits. While most newly undertaken ventures may not have the requisite record of performance and thus come within the "new business rule," that is a decision to be made by the trial court in the first instance. In allowing the jury to consider Maximus' evidence of lost profits and other damage evidence, the trial court here did not eliminate the new business rule or the requirement that damages must be shown with reasonable specificity. The trial court only held that, in a claim for intentional interference with a business expectancy, recovery will not be defeated solely because the business expectancy is not one which is identical in every detail to the injured party's previous actual experience. The trial court concluded that in this case the evidence of previous child support collection ventures conducted by Maximus in other jurisdictions and evidence of such collections by

the DSS in Virginia had sufficient specificity to allow "a reasonable estimate of Maximus' lost profits." Using this evidence, the jury was not required to speculate on Maximus' lost profits. Accordingly, we will affirm the trial court's ruling allowing evidence of Maximus' lost profits.

259 Va. at 109-10 (citation omitted).

The court holds that plaintiff in this case must also be given the opportunity to prove that its claim for lost profits is not speculative. That opportunity comes at trial, not in response to a motion for summary judgment.

## V. *Breach of Contract by Virginia Tech*

Virginia Tech's final ground in support of its motion for summary judgment is that Virginia Tech did not breach its contract with plaintiff. That ground is based upon the argument that plaintiff's contract with Virginia Tech is *ultra vires* and that plaintiff failed to timely exercise its option with CIT. Since the court has already rejected the motions for summary judgment on those grounds, summary judgment will also be rejected on this one.

## *Conclusion*

For all of the reasons set out above, the motions for summary judgment and CIT's motion to dismiss will be denied.