## Staunton

B. B. WOODSON, TRUSTEE IN BANKRUPTCY, ETC. V. GEORGE GILMER, ET AL.

September 11, 1964.

Record No. 5772.

Present, Spratley, Buchanan, Whittle, Snead, I'Anson and Carrico, JJ.

*James H. Michael, Jr. (William S. Aaron, Jr.; Michael & Dent; Walker, Woodson & Aaron, on brief), for the appellant.*

*Charles A. Via, Jr. (Carl E. Hennrich; David J. Wood, Jr.; Richmond & Via; Wood & Wood, on brief), for the appellees.*

BUCHANAN, J., delivered the opinion of the court.

Sterling R. Decker filed a bill of complaint against George Gilmer, George Gilmer, Jr., David J. Wood, Jr., and Joseph M. Wood, II, alleging that a partnership existed between him and said defendants;

that George Gilmer and others had instituted involuntary bankruptcy proceedings against him; that if he were adjudicated a bankrupt the partnership would be dissolved automatically under § 50-31 of the Virginia Code, and that disputes existing among the partners made it impracticable for the partnership to be wound up by any one of the partners.

The bill prayed that the court determine that the bankruptcy proceeding constituted a dissolution of the partnership; that it direct the winding up of its affairs; that a formal accounting be taken; and that a special receiver be appointed to take charge of the assets and settle the affairs of the partnership.

The defendants filed answers denying the existence of a partnership. By decree of July 16, 1962, the appellant, B. B. Woodson, Trustee in Bankruptcy, was substituted in the place of said Decker, and after hearing the evidence *ore tenus* the court entered the decree now appealed from holding that no partnership existed among the parties and that there was no need for the appointment of a special receiver.

The principal question here is whether the controlling evidence, which is not conflicting to any material degree, shows the existence of a partnership. In addition, appellant assigned error to the exclusion of certain business records offered in support of his claim that a partnership existed, and testimony regarding defendant Gilmer, Jr.'s, knowledge of partnership affairs.

In December 1956, Sterling R. Decker and Charles W. Hurt bought a tract of 110.68 acres of land on the outskirts of Charlottesville, intending to "develop" it. They consulted an attorney, defendant George Gilmer, Sr., and an agreement was drafted under which Decker and Hurt were to "share equally in the management, costs and expenses, and profits or losses" as partners. This agreement was never executed, however.

Because of his approaching military duty early in 1957, Hurt conveyed a two-sixths interest in the property to George Gilmer, Sr., and George Gilmer, Jr., pursuant to an agreement executed on the same day by Decker, Hurt and the two Gilmers. This agreement, which is the basis of plaintiff's claim that a partnership existed, was prepared by George Gilmer, Sr., a practicing attorney of long experience, and is set out in the margin.*

A few days after the execution of this agreement, Hurt sold his

---

*THIS AGREEMENT, made this 26th day of April, 1957, between Sterling R.

remaining one-sixth interest in the property to David J. Wood, Jr., and Joseph M. Wood, II. There was then written on the bottom of the agreement an addendum which was executed by Decker, the two Gilmers and the two Woods, reciting that the Woods "are accepted by the other parties in place of Charles W. Hurt and they agree to carry out Charles W. Hurt's obligations under this contract."

Decker, party of the first part, and Charles W. Hurt, George Gilmer, and George Gilmer, Jr., parties of the second part,

### WITNESSETH:

That Charles W. Hurt has agreed to sell, and George Gilmer, Jr. and George Gilmer have agreed to buy 2/3 of Charles W. Hurt's 1/2 interest in the 110.68 acres in Albemarle County, bought by Decker and Hurt, D.B. 330, p. 244, at 2/3 of what Charles W. Hurt has invested in the property and assuming 2/3 of his liability. * * *

It is agreed that Sterling R. Decker is to manage the development of this property. He will make assessments for the road as needed and for further development of the road and other improvements where and as needed. All the parties to this contract agree to pay their respective share of such assessment within 10 days * * *. The parties of the second part agree to sell a 1/2 interest in the first 53 lots of the subdivision on Commonwealth Drive and Dominion Drive at $1,000.00 each which shall include the construction of the road (the value of these lots with the road to them is put at $2,000.00). Sterling R. Decker agrees to buy these lots at an average rate of at least three a month after the road is completed and not later than January 1, 1958 and if he fails to do so the option expires. Berkley is to provide the roads and engineering, but the utilities are to be provided by Decker. Right to buy additional lots with road frontage is granted to Sterling R. Decker at the rate of $1,250.00 per lot so long as at least three lots in Berkley are bought each month.

Sites of wells, water tanks and sewerage disposal plants will be furnished Commonwealth Utilities, Incorporated, free of charge and also the right to Commonwealth Utilities, Incorporated, to construct water, sewerage and other utilities in all lots and for sewers to cross lots where the grade makes such crossing advisable.

Questions of policy shall be determined by vote of the owners who shall vote according to the share owned. George Gilmer's fees must be approved by both Decker and Hurt before being paid.

It is agreed that if anyone becomes dissatisfied or he fails to perform his obligation he and the others will try to agree on a transfer of his interest. If they are unsuccessful in effecting such transfer then they agree to try to get Henry A. Haden to fix the value of the share of the dissatisfied *partner*. If Henry A. Haden does not fix such value, then W. Wright Harrison shall be requested to fix the value. If he does not, the *partners* agree to try to find an appraiser acceptable to all. Cost of appraisal shall be borne by the *partnership* and appraiser, whether Henry A. Haden or another, shall fix his fee. Such *partner* agrees to sell his share at such price to such of the other *partners* as are willing to buy. Both of these methods of settlement shall be tried before *dissolution* is undertaken.

If any *partner* except Sterling R. Decker dies then the other *partners* agree to buy the share of the deceased *partner* at the value fixed as above and the estate of the deceased shall, if requested, sell to the others at such value.

Charles W. Hurt offers now to sell his 1/6 interest to any of the other *partners* that want to buy it at a profit of $2,000.00 to himself. Any time before this offer is accepted he reserves the right to sell it to anyone else at that figure, but he agrees to try to get someone that is agreeable to the other *partners*. [Italics added]

Gilmer, Sr., who drafted the agreement, Gilmer, Jr., and both Woods all testified that they read the agreement, were familiar with its provisions and intended to be bound thereby. All denied, however, any intent to enter into a partnership agreement. Gilmer, Sr., testified that the use of the words "partners" and "partnership" in the agreement was a "slip largely from just using loose language and following more or less earlier drafts with modifications."

The development of "Berkeley," as the subdivision came to be called, proceeded in this manner: Pursuant to the agreement, Decker assumed the management of the development and arranged for the building of roads. He had, previous to the execution of the agreement, employed an accountant, Frank Kessler, to keep books for various enterprises involved in the development of "Berkeley." Decker testified that after execution of the agreement, a copy was given to Kessler, who set up a system of books reflecting the operation of a partnership for the development of "Berkeley." Although Kessler never received specific instructions from any member of the organization as to what type of entity was involved, the general ledger contained "Special Accounts to Record Amounts Due from or to Partners." The books and records were kept at the "Chimneys," a building near the development, and were accessible to all parties who were also aware that Kessler was keeping the books, and at least one of the defendants visited the building several times.

Decker testified that he "believed" he opened a bank account between December 1956 and April 1957 for "Berkeley." A checkbook for "Berkeley, Sterling R. or Mary Jane Decker," was identified by Kessler as the organization's checkbook.

Periodically, Decker submitted to the Gilmers and Woods statements of costs incurred in the development and the credits, if any. At first, costs exceeded credits, and the Gilmers and Woods paid their pro rata shares of these expenses to Decker, who then paid for the work done. Later, as lots were sold to Decker, credits exceeded costs of development, and the Gilmers and Woods were credited with their pro rata shares of the proceeds of lot sales less the expenses incurred. From the organization's checkbook it appears that only David and Joseph Wood and Gilmer, Jr., received checks for their pro rata shares. Gilmer, Jr., also received one check made by Decker personally and marked "Dividends—Berkeley Partnership." Gilmer, Sr., was given credit on the organization's ledger for his pro rata share of the proceeds from lot sales.

A "Statement of Charges and Credits" for the year 1958, which

defendants admitted receiving, contained a reference to "Berkeley Partners." Three financial statements entitled "Berkeley, A Partnership" were prepared for periods ending during 1958 and 1959. Decker testified that copies of these financial statements were distributed to the members of the organization. Gilmer, Jr., and both Woods "thought" they received, and Gilmer, Sr., admitted receiving, tax forms prepared by the bookkeepers for the organization showing "Partner's Share of Income." Decker testified that copies of the federal partnership tax returns for the years 1958 and 1959 were shown to all parties. Defendants denied seeing such returns.

Gilmer, Sr., and Gilmer, Jr., reported for tax purposes amounts received from the Berkeley development under "other income." Joseph Wood reported such income on the line for partnership income. David Wood reported such income on the line for partnership income and specified the composition of the partnership as being "Wood and Wood, Gilmer, Gilmer and Decker."

On September 11, 1961, David Wood wrote a letter to Decker protesting the building of a swimming pool on a "reserved" portion of the land, and said that no further use should be made of the reserved portion "without the consent of all members of the partnership." The letter also contained this paragraph:

"It appears that you have constructed a swimming pool on the reserved twenty acre portion of the Berkley without consulting the other members of the partnership or without making any arrangement to compensate the partnership for the use of the land."

Copies of this letter were sent to Gilmer, Sr. (who represented his son, Gilmer, Jr.), and Joseph Wood.

In October 1961 Gilmer, Sr., advised an insurance company that "Berkeley Partners" should be included as an additional insured under a comprehensive automobile liability policy issued by the company to cover other business entities involved in the Berkeley development.

No member of the organization protested, or suggested changes for, the repeated references to the organization as a partnership, made in the agreement between the parties and in the transaction of business.

Partnership relations are grounded upon a contract, express or implied. *Cooper* v. *Knox*, 197 Va. 602, 90 S.E.2d 844.

"The test as to whether or not the agreement of the parties constituted a partnership, certainly as between themselves, is governed largely by their intention.

"* * 'This intent may be manifested by the terms of their agreement, the conduct of the parties to each other under it, or by the circumstances generally surrounding the transaction.' 20 R.C.L. 831." *Kennedy* v. *Mullins*, 155 Va. 166, 174, 154 S.E. 568, 570.

The intent of the parties manifested in a solemn document is not to be lightly regarded upon the occasion of a later disavowal of such intent. *Lucy* v. *Zehmer*, 196 Va. 493, 84 S.E.2d 516.

Here, an express agreement, drafted by an experienced attorney who was also a member of the association, repeatedly employed the use of partnership nomenclature, calling the parties thereto "partners" no fewer than eight times, referring to the entity as a "partnership" and to its ending as a "dissolution." Three of the defendant-signers were attorneys; one was a business executive of an important partnership. All four testified that they intended to bind themselves by the agreement.

The terms of the agreement are altogether indicative of, and consistent with, a partnership. First, partnership terminology, *Partners, Partnership* and *Dissolution*, is used. On the face of the agreement there appears no reason to deny these words their usual meaning. Second, the agreement recites the respective interests held by each of the parties as a co-owner of a tract of land, and shows the purpose of the association to be for the development of "this property." Third, the parties agreed to share the expenses of building roads upon the land in proportion to their interests in the land. Fourth, each party was given a voice in the resolution of "questions of policy." Fifth, provision was made for the optional acquisition of a dissatisfied party's interest by the other parties at an appraised price, with the costs of appraisal to be borne by the "partnership." Sixth, provision was made for the acquisition by the surviving partners of the interest of any partner, except Decker, in case of death.

There is no provision in the agreement expressly stating in terms that profits were to be shared. Defendants agreed to sell their interest in lots to Decker at stated prices [representing a value enhanced by Decker's management] and in stated numbers as the development progressed, leaving Decker to realize his own profit, if any, from resale of the lots. It will be observed that the arrangement for the sale of lots to Decker was optional with Decker, and if he had not exercised his option, the profits, if any, from lot sales would have been shared by all in proportion to each one's interest in the land. It will also be observed that defendants shared in the profits of the venture, and each one reported a portion of his dis-

tribution as taxable income. Under § 50-7 of the Virginia Code, the sharing of profits is *prima facie* evidence of the existence of a partnership.

From the contract itself no other conclusion can be drawn than that the five parties thereto intended to associate themselves, not merely as co-owners of a tract of land to be resold, but to pool their land and money, and in some instances talent and labor, for the improvement of the property. This venture contemplated more than mere association for speculation in land for resale, an arrangement which itself has been held to be a partnership. *Canada* v. *Barksdale*, 76 Va. 899. See also *Jones* v. *Murphy*, 93 Va. 214, 24 S.E. 825. The *improvement* of the land was of the essence of the agreement. To this improvement each contributed something, and each anticipated a profit in return.

The intent of the parties so strongly manifested by the agreement, considered together with the business transactions and the conduct of the parties subsequent to the agreement, furnishes conclusive evidence that a partnership existed.

Section 50-6 of the Virginia Code defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Defendants argue that the development of Berkeley was not a "business." Webster's Third New International Dictionary, Unabridged, defines business as a "commercial or industrial enterprise." It is hardly to be denied that the development of Berkeley was a "commercial enterprise."

Defendants say that the agreement was merely the manifestation of a tenancy in common. However, a tenancy in common existed without any agreement at all, and if such a tenancy was all that was intended, the agreement would have been a needless declaration of an already existing fact. All of the defendants testified that they paid no taxes or insurance on their shares of the property otherwise than through Decker as expenses of the enterprise.

The controlling facts here are established by evidence free of conflict, and we hold that the law, as applied to the facts, requires the conclusion that a partnership existed among the contracting parties.

This conclusion makes it unnecessary to consider appellant's as-signments of error relating to the conclusion of the evidence referred to above.

The decree appealed from is reversed and it is here adjudicated that a partnership existed among the parties as alleged in the bill.

It appearing that Sterling R. Decker has been adjudicated a bankrupt and that the said partnership therefore stands dissolved under § 50-31 of the Virginia Code, this cause is remanded to the Corporation Court with direction to appoint a special receiver to take over the assets and wind up the affairs of the partnership.

*Reversed and remanded.*